IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



UNITED STATES OF AMERICA

v.                                    Criminal No. 2:92CR163-5

RONALD EVANS

## MEMORANDUM OPINION

Ronald Evans, a federal inmate proceeding by counsel, submitted this successive motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion"). Evans argues that his life sentence without possibility of parole violates the Eighth Amendment[1] under Graham v. Florida, 560 U.S. 48 (2010), and that Graham announced a new, previously unavailable rule of constitutional law made retroactive to cases on collateral review by the Supreme Court of the United States, thus entitling Evans to relief. The Government has responded. Evans has replied. The matter is ripe for disposition. For the reasons stated below, the Court will grant in part and deny in part Evans's successive § 2255 Motion.

## I.    PROCEDURAL HISTORY

On December 12, 1992, a jury convicted Evans of conspiracy to distribute and possession with intent to distribute in excess

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

of five kilograms of cocaine, in excess of one kilogram of heroin, and more than fifty grams of a mixture containing cocaine base, in violation of 21 U.S.C. § 846 (Count One), and possession with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts Eight, Eleven, Fourteen, Twenty-Three, Thirty-Six, Forty-One). (Judgment in a Criminal Case 1-2.)   On July 30, 1993, the Court sentenced Evans to life in prison on Counts One and Thirty-Six, 240 months on Counts Eight, Fourteen, Twenty-Three, Forty-One, and 480 months on Count Eleven.   (Judgment in a Criminal Case 3-4.)   The United States Court of Appeals for the Fourth Circuit affirmed.   United States v. Hazel, Nos. 93-5634, 93-5635, 93-5636, 93-5637, 1994 WL 642198, *8 (4th Cir. Nov. 15, 1994).   On April 24, 1995, the United States Supreme Court denied Evans's petition for a writ of certiorari.   Evans v. United States, 514 U.S. 1087 (1995).

On February 26, 1998, this Court denied Evans's first motion filed pursuant to 28 U.S.C. § 2255.   Thereafter, Evans sought permission from the Fourth Circuit to file a successive § 2255 motion based upon the Supreme Court's decision in Graham v. Florida, 560 U.S. 48 (2010).   On October 6, 2011, the Fourth Circuit granted Evans authorization to file this successive § 2255.   In re Evans, 449 F. App'x 284, 284 (4th Cir. 2011).

## II.   SUCCESSIVE § 2255 MOTIONS

### A.   Standard For Successive § 2255 Motions

The Fourth Circuit granted Evans pre-filing authorization to file a successive motion in this Court pursuant to 28 U.S.C. § 2255(h)(2).   Under § 2255(h)(2), Evans must demonstrate that his claim is based upon "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."   28 U.S.C. § 2255(h)(2).   In his § 2255 Motion, Evans raises entitlement to relief based upon the following claims:

| | |
|---|---|
| Claim One: | Evans's life sentence without possibility of parole violates the Eighth Amendment under Graham v. Florida, 650 U.S. 48 (2010). |
| Claim Two: | Graham announced a new, previously unavailable rule of constitutional law made retroactive to cases on collateral review by the United States Supreme Court, thus entitling Evans to review of his sentence pursuant to § 2255(h). |

(§ 2255 Mot. 10-11.)   Despite Evans's delineation of two claims, the Court construes Evans to raise one claim: whether Evans is entitled to relief under § 2255(h)(2).

The Fourth Circuit's determination that Evans satisfies § 2255(h) "is 'tentative in the following sense: the district court must dismiss the motion that [the Fourth Circuit has] allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied

3

the requirements for the filing of such a motion.'" <u>McLeod v. Peguese</u>, 337 F. App'x 316, 324 (4th Cir. 2009) (quoting <u>Bennett v. United States</u>, 119 F.3d 468, 470 (7th Cir. 1997)). Thus, it is necessary to examine Evans's claim and dismiss it, if the Court finds that it is barred under § 2255(h). <u>See United States v. MacDonald</u>, 641 F.3d 596, 604 (4th Cir. 2011) (citing <u>United States v. Winestock</u>, 340 F.3d 200, 205 (4th Cir. 2003)).

To satisfy 28 U.S.C § 2255(h)(2), Evans must demonstrate: (1) the rule announced in <u>Graham</u> constitutes a new rule of constitutional law that was previously unavailable; and (2) the Supreme Court has made the rule announced in <u>Graham</u> retroactive to cases on collateral review. As explained below, Evans satisfies both requirements.[2]

B.  **Graham v. Florida**

In <u>Graham</u>, the issue was "whether the Constitution permits a juvenile offender to be sentenced to life in prison without parole for a nonhomicide crime." 560 U.S. 52-53. The state of Florida charged Graham, a sixteen-year-old, as an adult, and Graham pled guilty to, <u>inter alia</u>, a count of "armed burglary with assault or battery," a felony carrying a maximum sentence of life without parole under Florida law. <u>Id.</u> at 53 (citation omitted). The Florida trial court sentenced Graham to probation

---

[2] The Government does not challenge this conclusion.

4

and withheld adjudication of guilt. Id. at 54. On December 2, 2004, thirty-four days shy of his eighteenth birthday, Graham again was arrested and charged with a probation violation after his alleged involvement in two additional robberies committed that evening. Id. at 54-55. The trial court adjudged Graham to be in violation of his probation, imposed judgment on the earlier armed burglary and attempted armed robbery charges, and sentenced him to life imprisonment without parole. Id. at 57.

On direct appeal, the Supreme Court found that Graham's life sentence without parole violated the Eighth Amendment's prohibition against cruel and unusual punishment. Id. at 74-75. The Court held that:

> for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole. This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime.

Id. at 74-75 (alteration in original) (quoting Roper v. Simmons, 543 U.S. 551, 574 (2005)). The Supreme Court further explained that "[c]ategorical rules tend to be imperfect, but one is necessary here." Id. at 75.

### C. Graham Constitutes A New Rule That Was Previously Unavailable

5

The Supreme Court has explained that "'a case announces a new rule if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final.'" <u>Chaidez v. United States</u>, 133 S. Ct. 1103, 1107 (2013) (quoting <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989)). "[A] holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" <u>Id.</u> (quoting <u>Lambrix v. Singletary</u>, 520 U.S. 518, 527-528 (1997)). The Court agrees with the Sixth and Eleven Circuits that "<u>Graham</u> set out a new rule of constitutional law that was not previously available. The 'case was the first recognition that the Eighth Amendment bars the imposition of life imprisonment without parole on non-homicide offenders under age eighteen.'" <u>In re Moss</u>, 703 F.3d 1301, 1302-03 (11th Cir. 2013) (quoting <u>In re Sparks</u>, 657 F.3d 258, 260 (5th Cir. 2011)); see <u>Moore v. Biter</u>, 725 F.3d 1184, 1190 (9th Cir. 2013) (assuming that <u>Graham</u> announced a new rule).

### D. The Supreme Court Has Made The Rule Announced In <u>Graham</u> Retroactive To Cases On Collateral Review

#### 1. Retroactivity Of New Rules Under <u>Teague</u>

Under <u>Teague v. Lane</u>, 489 U.S. 288 (1989), "new rules of constitutional law are generally 'not . . . applicable to those cases which have become final before the new rules are announced.'" <u>United States v. Mathur</u>, 685 F.3d 396, 399 (4th Cir. 2012) (omission in original) (quoting <u>Teague</u>, 489 U.S. at

6

310). *Teague* recognizes two narrow exceptions to the general rule of nonretroactivity. *Id.* Under the exception pertinent here, "a rule is deemed retroactive if it 'places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *In re Sparks*, 657 F.3d at 261 (quoting *Teague*, 489 U.S. at at 307); *Moore*, 725 F.3d 1190. This exception extends "'not only [to] rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.'" *In re Sparks*, 657 F.3d at 261 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *overruled on other grounds by* Atkins v. Virginia, 536 U.S. 304 (2002)); *see* Moore, 725 F.3d at 1190.[3]

### 2. Retroactivity Of A New Rule In the Context Of 28 U.S.C. § 2255(h)(2)

For purposes of pursuing a successive § 2255 motion under § 2255(h), Congress made "[t]he Supreme Court . . . the only entity that can 'ma[k]e' a new rule retroactive." *In re Elwood*,

---

[3] The second *Teague* exception provides that "a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 307 (omission in original) (citations omitted) (internal quotation marks omitted). The second "exception is 'extremely narrow,' *Schriro v. Summerlin*, 542 U.S. 348, 252 (2004), as it is reserved only 'for watershed rules implicating fundamental fairness.'" *Mathur*, 685 F.3d at 399 (quoting *United States v. Sanders*, 247 F.3d 139, 148 (4th Cir. 2001)) (internal parallel citations omitted). The parties do not suggest this exception applies here.

408 F.3d 211, 212-13 (5th Cir. 2005) (quoting <u>Tyler v. Cain</u>, 533 U.S. 656, 663 (2001)). Accordingly, for purposes of § 2255(h)(2) a "'new rule becomes retroactive, not by the decisions of the lower court or by the combined action of the Supreme Court and the lower courts, but simply by the action of the Supreme Court.'" <u>Id.</u> at 213 (quoting <u>Tyler</u>, 533 U.S. at 663). The Supreme Court makes "a case retroactive on collateral review through a single express holding or by "'[m]ultiple cases . . . if the holdings in those cases necessarily dictate retroactivity of the new rule.'" <u>In re Moss</u>, 703 F.3d at 1303 (quoting <u>Tyler</u>, 533 U.S. at 666).

In her concurring opinion in <u>Tyler</u>, Justice O'Connor explained how multiple holdings together "necessarily dictate" retroactivity, especially for those cases fitting within the first <u>Teague</u> exception:

> This Court . . . may "ma[k]e" a new rule retroactive through multiple holdings that logically dictate the retroactivity of the new rule. To apply the syllogistic relationship described by [the dissent and approved by the majority opinion], if we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review. In such circumstances, we can be said to have "made" the given rule retroactive to cases on collateral review.
>
> The relationship between the conclusion that a new rule is retroactive and the holdings that "ma[k]e" this rule retroactive, however, must be strictly

logical- _i.e._, the holdings must <u>dictate</u> the
conclusion and not merely provide principles from
which one <u>may</u> conclude that the rule applies
retroactively . . . .

It is relatively easy to demonstrate the required
logical relationship with respect to the first
exception articulated in <u>Teague v. Lane</u>.  Under this
exception, "a new rule should be applied retroactively
if it places 'certain kinds of primary, private
individual conduct beyond the power of the criminal
law-making authority to proscribe.'"  When the Court
holds as a new rule in a subsequent case that a
particular species of primary, private individual
conduct is beyond the power of the criminal lawmaking
authority to proscribe, it necessarily follows that
this Court has "made" that new rule retroactive to
cases on collateral review.  The Court has done so
through its holdings alone, without resort to dicta
and without any application of principles by lower
courts.

<u>Tyler</u>, 533 U.S. at 668-69 (first, third, fourth alteration in

original) (emphasis in original) (citations omitted).  As

explained below, multiple cases dictate that the Supreme Court

"made" the new rule in <u>Graham</u> applicable to cases on collateral

review.

### 3.  The Rule In <u>Graham</u> Satisfies The Requirements Of 28 U.S.C. § 2255(h)(2)

As the United States Court of Appeals for the Fifth Circuit

aptly explained, the Supreme Court's decisions in <u>Atkins</u>, 536

U.S. at 321 (barring the execution of the "mentally retarded"),

and <u>Roper v. Simmons</u>, 543 U.S. 551, 568 (2005) (barring the

execution of juvenile offenders), "both 'prohibit[ ] a certain

category of punishment for a [certain] class of defendants

because of their status or offense,'" <u>In re Sparks</u>, 657 F.3d at

262 (alterations in original) (quoting Penry, 492 U.S. at 330), and "so too does Graham, which bars the imposition of a sentence of life imprisonment without parole on a juvenile offender." Id.; accord Moore, 725 F.3d at 1190; In re Moss, 703 F.3d at 1303. Thus, "[b]y the combined effect of the holding of Graham itself and the first Teague exception, Graham was therefore made retroactive on collateral review by the Supreme Court as a matter of logical necessity under Tyler." In re Sparks, 657 F.3d at 262; accord Moore, 725 F.3d at 1190; In re Moss, 703 F.3d 1302-03.

Those decisions likewise dictate the conclusion that Evans's claim is based upon a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court. See 28 U.S.C. § 2255(h)(2). Furthermore, Evans demonstrates entitlement to relief with respect to his sentence of life imprisonment for Count Thirty-Six.

Nevertheless, as discussed below, Evans fails to demonstrate that Graham extends to his adult conviction and sentence for Count One.

### III.  EVANS'S CRIMINAL CONDUCT

#### A. Pertinent Charged Conduct

On September 23, 1992, the grand jury returned a fifty-count indictment against Evans and five co-conspirators. Count

10

One charged that, beginning in the Winter of 1989 through the date of the indictment, Evans and his co-conspirators willfully, knowingly, and intentionally conspired to distribute and possess with the intent to distribute in excess of five kilograms of cocaine, in excess of one kilogram of heroin, and more than fifty grams of a mixture containing cocaine base, in violation of 21 U.S.C. § 846.    The grand jury charged Evans in nine additional substantive counts of possession with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 841(a)(1).

The Indictment charged that the roles assumed by Evans and co-conspirators "were interchangeable" and included, among others "financier, organizer, manager, distributor, packager, currency courier, narcotics courier, lookout and armed security."    (Indictment 3-4.)    The Indictment charged fifty-eight overt acts, in furtherance of the conspiracy beginning in the Winter of 1989 with the final charged overt acts occurring in January 1992.    Amongst the additional substantive counts, Count Thirty-Six charged that, in the Summer of 1991, Evans knowingly and intentionally possessed with intent to distribute approximately one-half kilogram of a mixture of substance containing cocaine base.    (Id. at 29-30.)    Count Forty-Nine charged that on or about January 1992, Evans knowingly and intentionally possessed with intent to distribute approximately

11

one ounce of a mixture or substance containing cocaine base. (Id. at 36.) Evans turned eighteen on December 5, 1991.

### B. Evidence Adduced At Trial

#### 1. Beginning Of The Conspiracy

Stanford Vann, Chris Hamlin, and Corey Roulack testified that, in the Winter of 1989 and 1990, they worked for Stacey Robinson selling heroin and cocaine in "the hole," an area adjacent to the Huntersville apartment complex in Norfolk. (Nov. 25, 1992 Tr. 74-78; Dec. 1, 1992 Tr. 586-89, 593; Dec. 3, 1992 Tr. 1427-30.) Roulack and Vann testified that Ronald Evans ("Freak"), began selling heroin for Robinson a couple of months later. (Nov. 25, 1992 Tr. 79, 81; Dec. 1, 1992 Tr. 591-93.)

#### 2. Evans's Rise In The Conspiracy

Vann testified that Robinson also stored heroin in Perchristian Dozier's apartment at 800 East Princess Anne Road. (Dec. 1, 1992 Tr. 594.) Roulack testified that Evans's initial role in the conspiracy involved delivering heroin from Perchristian and Sherman Dozier a/k/a Ma and Pop's apartment in the complex to the street-level sellers. (Nov. 25, 1992 Tr. 82, 84.) A month after Evans became involved in the heroin conspiracy, Evans "graduated up in the organization" and began to sell. (Nov. 25, 1992 Tr. 82.) Roulack explained that as "you were trusted more" by Robinson you would move from selling heroin to collecting money for Robinson. (Nov. 25, 1992 Tr.

12

82.)  Roulack testified that the men would take turns conducting street sales.  (Nov. 25, 1992 Tr. 83.)

Vann and Hamlin testified that Evans initially served as a "lookout for the police," but that Evans later started selling heroin and collecting money.  (Dec. 1, 1992 Tr. 592-93; Dec. 3, 1992 Tr. 1434.)  Earl Williams, Robinson's heroin supplier, testified that Evans "moved up to where he would collect the money" and would fly up to New York to deliver money.  (Nov. 25, 1992 Tr. 216-18, 36.)

Roulack, Lee Walls, and Vann's brother, Orlander Graves, all members of the conspiracy, testified that the group, including Evans, sold drugs for Robinson from around eleven a.m. until approximately nine or ten p.m., seven days a week.  (Nov. 25, 1992 Tr. 81; Dec. 1, 1992 Tr. 754-55, 760, 779; Dec. 2, 1992 Tr. 990; Dec. 3, 1992 Tr. 1479-80, 1482-83.)  Roulack testified that Robinson's group made up to $90,000 a day in drug sales.  (Nov. 25, 1992 Tr. 81.)  Vann and Roulack testified that Evans sold heroin with them every day.  (Nov. 25, 1992 Tr. 126-28, 144; Dec. 1, 1992 Tr. 706-07.)

Roulack and Vann explained that Evans, Roulack, and Vann served the same role in the organization.  (Nov. 25, 1992 Tr. 130-31; Dec. 1, 1992 Tr. 706.)  Roulack testified that they distributed drugs, packaged drugs, collected money, and delivered money to Earl Williams, a heroin supplier in New York.

13

(Nov. 25, 1992 Tr. 129-30, 216-17.)   Vann, Evans, Hamlin, Roulack, and Walls resupplied heroin to, and collected money from, the people conducting heroin sales in "the hole."   (Dec. 1, 1992 Tr. 622-23, 706, 758, 780; Dec. 3, 1992 Tr. 1482-83.)

Thomas Turner, a rival of Robinson's, testified that Evans "played a major role," in the conspiracy and that Vann, Evans, and Hamlin served as "lieutenants."   (Dec. 7, 1992 Tr. 1751-53, 1760, 1770.)   Turner observed Evans selling drugs and collecting drug money.   (Dec. 7, 1992 Tr. 1765.)

Roulack, Hamlin, and Vann testified that "Ma" Dozier, Tamara ("Tammy") George, Desiree Hendricks, William Hazel ("Beanie"), and Evans packaged the heroin in Ma Dozier's apartment.   (Nov. 25, 1992 Tr. 84-87; Dec. 1, 1992 Tr. 598-99; Dec. 3, 1992 Tr. 1240, 1269, 1433.)   Hamlin testified that the group packaged heroin on a daily basis.   (Dec. 3, 1992 Tr. 1433.)

### 3. Evans's Conduct Beginning In The Summer Of 1990

By June of 1990, Evans's daily activities became even more directed toward furthering the objectives of the conspiracy.   In May or June 1990, Evans and Roulack flew from Norfolk to New York to deliver approximately $8000 from heroin sales to Williams.   (Nov. 25, 1992 Tr. 91, 145, 245; Dec. 1, 1992 Tr. 607.)   Roulack and Evans each carried half of the money.   (Nov. 25, 1992 Tr. 134.)

14

Vann testified that later in the summer of 1990, he and Evans flew to New York with approximately $7000 split between them. (Dec. 1, 1992 Tr. 607-08, 665.)

Earl Williams testified that Evans sent at least one money transfer by Western Union to members of the conspiracy in New York (Nov. 25, 1992 Tr. 242-44), and confirmed that Evans twice made personal deliveries of cash to New York (Nov. 25, 1992 Tr. 244-45). Shawn Scott testified that she received a $3000 Western Union transfer from Evans on May 9, 1991, and that she gave the money to Williams. (Nov. 30, 1992 Tr. 562.)

After police executed a search warrant at the Dozier's apartment in August 1990, Robinson stored heroin at LeQuita McDowell and Jason Robinson's apartment in Huntersville Village. (Dec. 1, 1992 Tr. 595, 845.) McDowell testified that she packaged heroin in the apartment two or three times. (Dec. 1, 1992 Tr. 844-45.) McDowell testified that Robinson, Evans, or Vann brought the heroin to the house for packaging. (Dec. 1, 1992 Tr. 846, 849-50, 857.) After packaging, Vann, Evans, or Hamlin picked up fifty packages of heroin at a time and returned throughout the day to obtain more heroin for street sale. (Dec. 1, 1992 Tr. 595-96, 848; Dec. 3, 1992 Tr. 1440.)[4]

---

[4] McDowell and Hamlin testified the men picked up heroin from the apartment three or four times a day. (Dec. 1, 1992 Tr. 848; Dec. 3, 1992 Tr. 1440.) Vann testified that they picked up heroin ten times a day. (Dec. 1, 1992 Tr. 596.)

Numerous witnesses testified to Evans's increasing and ongoing role in the conspiracy. William Bond testified that he bought heroin from Evans once or twice a week until Bond's arrest on June 7, 1991. (Dec. 2, 1992 Tr. 1028-29.) Tamara George described Evans as one of Robinson's "sidekicks" and testified that Evans assisted Robinson as a "gopher" and by packaging drugs. (Dec. 3, 1990 Tr. 1252-53, 1262-64.) Desiree Hendricks testified that she packaged two or three sandwich bags of heroin every other day for Robinson. (Dec. 3, 1992 Tr. 1272-73.) Hendricks testified that Evans "used to be with Stacey all the time" and Evans picked up cocaine from her apartment. (Dec. 3, 1992 Tr. 1278-79, 1283.) Shameka Dozier testified that from "all of '90 up through July of '91" (Dec. 3, 1992 Tr. 1310), she observed Evans sell drugs "in the parking lot. It was like an everyday thing . . . . Monday through Sunday." (Dec. 3, 1992 Tr. 1306-08.)

### 4. Evans's Role In The Distribution Of Crack From Spring Of 1991 Until September 9, 1991

Vann, Roulack, Hamlin, and Graves testified that, in the Spring of 1991, the conspiracy began selling crack cocaine. (Nov. 25, 1992 Tr. 100-01; Dec. 1, 1992 Tr. 612, 888; Dec. 3, 1992 Tr. 1443-44.) Vann and Graves testified that Robinson obtained kilogram quantities of powder cocaine for approximately $24,000 and converted the powder cocaine to crack cocaine at

16

Apartment 73 in Huntersville (Dec. 1, 1992 Tr. 612-13, 618-19, 703, 892-93), or bought crack cocaine from a man named TaTa. (Dec. 1, 1992 Tr. 613.)   Hamlin testified that he, Vann, Robinson, and Evans watched Gregory Mason ("Jeep") convert the powder to crack cocaine.   (Dec. 3, 1992 Tr. 1445-48.)   Vann, Hamlin, and Evans sold the crack cocaine for Robinson.   (Nov. 25, 1992 Tr. 100-01; Dec. 1, 1992 Tr. 613; Dec. 3, 1992 Tr. 1450.)

Roulack testified that Robinson sold one-ounce quantities out of Robinson's mother's apartment in Huntersville Village. (Nov. 25, 1992 Tr. 100-01.)   In April or May of 1991, Roulack observed Evans selling crack cocaine two or three times on the street corner in Berrard Park.   (Nov. 25, 1992 Tr. 101-02.)   In May of 1991, Roulack observed Evans in Robinson's apartment in Huntersville with approximately seven grams of crack cocaine in his hand.   (Nov. 25, 1992 Tr. 102.)

Vann testified that he and Evans would each obtain an ounce of crack from Robinson two or three times a week and sold each for approximately $1000 to $1200, yielding approximately $600 or $700 in profit.   (Dec. 1, 1992 Tr. 616, 619.)   Vann testified that he observed Evans sell drugs in 1991 and he and Evans sold together.   (Dec. 1, 1992 Tr. 666.)

Hamlin testified that Evans obtained crack cocaine in half-ounce quantities and sold it on the corner in the Berrard Park

17

neighborhood of Norfolk.  (Dec. 3, 1992 Tr. 1450-51.)  Robinson and Hamlin picked up money from Evans.  (Dec. 3, 1992 Tr. 1451.)

On September 9, 1991, the police executed a search warrant at Apartment No. 73 where Robinson had the cocaine powder converted to crack cocaine.  (Dec. 1, 1992 Tr. 620, 650; Dec. 7, 1992 Tr. 1683-84.)  Police found baking soda and a roasting pan, used to convert powder cocaine to crack cocaine, plastic sandwich bags, scales, guns, and eleven ounces of crack cocaine in the apartment.  (Dec. 7, 1992 Tr. 1683-87.)

### 5.    Evans's Role In The Conspiracy After September 9, 1991 Through January of 1992

Vann and Bridget Thomas, Robinson's girlfriend until February of 1992, testified that, after the police "busted" the apartment, the group stored the crack cocaine in, and operated out of, Evans's apartment on Maltby Avenue where he lived with his mother.  (Dec. 1, 1992 Tr. 620-21; Dec. 7, 1992 Tr. 1781-82.)  Thomas testified that Jeep came to Evans's house in October or November of 1991 to obtain money from Robinson.  (Dec. 7, 1992 Tr. 1783.)

Hamlin testified that he got out of jail in November of 1991, and that he soon thereafter accompanied Robinson to buy powder cocaine on two occasions.  (Dec. 3, 1992 Tr. 1444-45.)  On both occasions, Robinson purchased one half of a kilogram of powder cocaine.  (Dec. 3, 1992 Tr. 1444.)

18

Vann testified that he was incarcerated from November 8, 1991 until December 24, 1991. (Dec. 1, 1992 Tr. 621-22.) Vann testified that as of his December 24, 1991 release from jail, Evans was still selling crack cocaine. (Dec. 1, 1992 Tr. 622.) Between January 1, 1992 and his arrest later in January, Vann testified that Robinson gave Evans, a man named "Eye," and himself, an ounce each of crack cocaine to sell. (Dec. 1, 1992 Tr. 622.)[5]

### C.   Jury's Verdict

The jury convicted Evans of the conspiracy count (Count One), which involved conduct in furtherance of the conspiracy between the Winter of 1989 through the date of the September 23, 1992 Indictment. The jury convicted Evans of additional substantive drug distribution counts, including Count Thirty-Six, which alleged that in the Summer of 1991, Evans possessed with the intent to distribute crack cocaine. The jury acquitted Evans of, inter alia, Count Forty-Nine, which alleged that in January of 1992, Evans possessed with the intent to distribute crack cocaine.

### D.   Sentencing Findings

During sentencing the Court concluded that "the record at trial established that each defendant engaged in a conspiracy

---

[5]   Any testimony relating to the conduct by Evans after December 5, 1991 would depict adult participation in the conspiracy.

lasting from December of 1989 to September of 1992 to distribute and to possess with intent to distribute heroin, cocaine and cocaine base, and this was a jointly undertaken activity according to the proof at trial." (Jul. 30, 1993 Tr. 311.) For Evans, the Court found:

> Mr. Evans began work for Stacey Robinson as a lookout at the end of 1989 or early 1990. He continued as a member of the conspiracy for which he was convicted until January of 1992. Over time his role increased. He sold heroin, he packaged heroin, he was a runner, he was distributing packaged heroin to the street sellers, and he collected money, and he wired money, and he traveled to New York to pick up heroin and to deliver money. He also sold cocaine and crack and was present when Mr. Mason cooked crack in 1991.

(Jul. 30, 1993 Tr. 318.) The Court found Evans "responsible either directly or by imputation as a consequence of what was reasonably foreseeable and in furtherance of the joint activity of which he was convicted and in which he was engaged" for "40.483 kilograms of heroin" and "37.25 kilograms of cocaine." (Jul. 30, 1993 Tr. 318-19.) With respect to crack cocaine, the Court found the following:

> [T]here is evidence of the group's involvement in the crack business from April or May of 1991, and there's also evidence there was crack after November of '91. I am not confident that the proof is sufficient for me to make a finding of quantity other than that which I am going to make, and I am basically going to find that the amount of crack for which Mr. Evans is responsible was that which was prepared through the period of June, 1991 through November 8th of 1991 at a rate of one-half kilo per week, and that's a period of 23 weeks. . . . [and converted] you get 10.19 kilograms of crack . . .

(Jul. 30, 1993 Tr. 319-20.)   The Court also determined that between November 8, 1991 and January 3, 1992, Evans was responsible for an additional 3.54 kilograms of crack.   (Jul. 30, 1993 Tr. 320.)   The Court continued:

> Now, I believe earlier in these findings in connection with Mr. Evans I may have misstated that I did not think the evidence was sufficient to support a finding from November 8, 1991 to January of 1992. I do in fact find the evidence is sufficient by a preponderance to cover that period of time and misspoke myself because I was basically focusing only on the calculations for the period up through November 8 when I actually made that statement.
>
> If you make a conversion, you get 3.54 kilograms during the period of November 8, '91 to early January, 1992. It was January 3rd, I think. You will not find that date in record anywhere, but some of the witnesses testified to early January. I just took the earliest part of January and defined it as the 3rd and rounded it off from the 8th of November to get the number of weeks.

(Jul. 30, 1993 Tr. 320-21.)   The Court sentenced Evans to life in prison for Counts One and Thirty-Six.

### III. ANALYSIS

#### A.   Evans Fails To Demonstrate That Graham Applies To His Sentence For Count One

To avail himself of Graham v. Florida to invalidate his sentence under the Eighth Amendment, Evans must demonstrate that he "[was] below [eighteen years old] when the offense was committed," and, thus "may not be sentenced to life without parole for a nonhomicide crime."   560 U.S. 48, 74-75 (2010) (citing Roper v. Simmons, 543 U.S. 551, 574 (2005)).   Although

21

Evans makes such a showing for Count Thirty-Six, as explained below, Evans fails to make such a showing for the conspiracy offense in Count One.  Evans turned eighteen on December 5, 1991, and he remained a member of the conspiracy beyond that time.  Thus, Evans possesses adult liability, making Graham inapplicable to his sentence for the conspiracy conviction.

Evans argues:  "At trial, Mr. Evans was convicted of several counts of criminal conduct committed at age 16 and 17, but he was acquitted of [Count Forty-Nine] the only post-18 conduct charged in the indictment."  (§ 2255 Mot. 2.)  Evans believes that, because "the Government can point to nothing in the record to dispute Mr. Evans's claim that his own personal conduct underlying his life sentence occurred entirely while he was a juvenile," his sentence violates the Eighth Amendment under the rule in Graham.  (Reply 2.)  As discussed below, Evans misplaces the burden of proof.  A "habeas petitioner traditionally bears the burden of demonstrating constitutional error."  Occhicone v. Crosby, 455 F.3d 1306, 1310 (11th Cir 2006) (citing Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001)).

Evans fails to demonstrate, as he must, that he withdrew from this conspiracy before his eighteenth birthday.  Moreover, the evidence demonstrates that Evans continued as an active member of the conspiracy after his eighteenth birthday.

22

## 1.  Standard Of Review For Claim
##      Of Constitutional Error

By Memorandum Order entered September 10, 2013, the Court explained that, under § 2255, Evans has the burden to demonstrate that Graham extends to his convictions and sentence. Because "[i]t is currently unclear what Evans must demonstrate to obtain relief," the Court directed the parties to supply and brief the appropriate standard of review for Evans's claim that he is entitled to relief on collateral review.  (ECF No. 88, at 2.)  Both parties failed to follow the Court's directives as neither provided a standard of review.[6]

After Graham, to support a sentence of life without parole on the conspiracy count, the Government would be required to prove that Evans possessed criminal liability after his eighteenth birthday.  To demonstrate error on collateral review, in cases where a claim was not raised during trial or on direct review, courts have required a showing of cause and actual prejudice.  United States v. Frady, 456 U.S. 152 (1982).[7]

In Frady, the petitioner, convicted of first-degree murder, asserted error on collateral review based upon defective jury

[6]  Instead, the Government maintains that Graham has no applicability to Evans's conspiracy conviction while Evans continues to misplace the burden of proof on the Government.

[7]  While the Court determines that the actual prejudice standard applies to the present challenge, based upon the evidence presented at trial, the Court believes that Evans cannot prevail in demonstrating that he only possessed juvenile liability on the conspiracy count under any standard of review.

instructions that improperly compelled the jury to presume malice and therefore wrongfully eliminated the possibility of a manslaughter verdict.  Id. at 157-58.  The Supreme Court rejected use of the plain error standard on habeas and "reaffirm[ed] the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle that would exist on direct appeal."  Id. at 166.  The Frady court determined that the proper standard for review was "'cause and actual prejudice.'"  Id. at 167.  The Court explained:  "Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains."  Id. at 167-69.

The Court found it unnecessary "to determine whether Frady has shown cause, because we are confident he suffered no actual prejudice of a degree sufficient to justify collateral relief 19 years after his crime."  Id. at 168.  The Court explained that to demonstrate prejudice, for errors in the jury charge, "the degree of prejudice resulting from instruction error [must] be evaluated in the total context of the events at trial."  Id. at 169.

As Frady is applied to this case, Evans must "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 170.   As explained below, Evans has failed to discharge that burden. First, Evans has not directed the Court to any colorable evidence that he withdrew from the conspiracy before his eighteenth birthday.   Thus, under settled law, his participation is presumed.   Moreover, the evidence presented at trial compels the conclusion that he remained an active part of the drug conspiracy after his eighteenth birthday.

### 2.   Evans Failed To Demonstrate His Withdrawal

To convict a defendant of a narcotics conspiracy, "the Government must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willingly participated in the agreement (that he was a member of the conspiracy)." Smith v. United States, 133 S. Ct. 714, 719 (2013).   "[A] defendant need not be involved in every phase of that conspiracy to be deemed a participant." United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988).   Moreover, "a defendant who [joins] a conspiracy continues to violate the law 'through every moment of [the

25

conspiracy's] existence,' and he [is] responsible for the acts of his co-conspirators in pursuit of their common plot." Smith, 133 S. Ct. at 719 (alteration in original) (internal citations omitted).

A defendant's participation in the conspiracy, once established, "is presumed to continue until he withdraws from the conspiracy by affirmative action." United States v. Lispscomb, 494 F. App'x 314, 316 (4th Cir. 2012). "Withdrawal from a conspiracy, 'requires the defendant to take affirmative actions inconsistent with the object of the conspiracy and communicate his intent to withdraw in a manner likely to reach his accomplices.'" Id. (quoting United States v. Cardwell, 433 F.3d 378, 391 (4th Cir. 2005)). "Passive nonparticipation" in the conspiracy fails to constitute withdrawal. Smith, 133 S. Ct. at 720. Instead, a defendant must demonstrate that he took an affirmative action "to defeat or disavow the purposes of the conspiracy." Lispscomb, 494 F. App'x at 316 (citing United States v. West, 877 F.2d 281, 289 (4th Cir. 1989)). And, the burden rests with Evans to establish his withdrawal from the conspiracy. Smith, 133 S. Ct. at 719.

The evidence demonstrates that Evans joined the conspiracy by early 1990 and remained in it through 1992. While the jury acquitted Evans of a substantive offense of crack cocaine distribution alleged to have occurred during January of 1992,

26

Evans has presented no evidence that he withdrew from the conspiracy at any point, much less before his eighteenth birthday on December 5, 1991. Instead, the evidence demonstrates the contrary. While Evans began as a police lookout, his role increased over time, and he became a key player in the drug conspiracy. Witnesses testified that Evans engaged in and furthered all facets of the conspiracy: he sold powder cocaine, packaged heroin and resupplied heroin to the street-level sellers, collected money, delivered thousands of dollars of drug proceeds to the supplier in New York, and observed the conversion of powder cocaine to crack cocaine.

Two witnesses testified that beginning in September of 1991, three months before his eighteenth birthday, Evans took on an even greater supervisory role in the conspiracy, as he began to store the operation's crack cocaine in the apartment where he lived with his mother. (Dec. 1, 1992 Tr. 620-21; Dec. 7, 1992 Tr. 1781-82.) Co-conspirator Stanford Vann also testified that he observed Evans obtain crack cocaine from Robinson, another co-conspirator, in January of 1992. (Dec. 1, 1992 Tr. 622.) Evans puts forth no evidence that he took an affirmative action to withdraw from the conspiracy at any time. The fact that the jury acquitted Evans of Count Thirty-Six (which stemmed from Vann's testimony) does not serve to establish that Evans withdrew from the conspiracy before his eighteenth birthday.

Because Evans failed to establish that he withdrew from the conspiracy before his eighteenth birthday, or, for that matter, ever, his continued involvement "is presumed." Lispscomb, 494 F. App'x at 316.[8]   In fact, as discussed below, the evidence demonstrates that Evans continued to be an active member of the conspiracy beyond his eighteenth birthday.

### 3.   Evans Possesses Personal Culpability Beyond His Eighteenth Birthday

In his Reply, Evans insists that, "[i]n the context of the Eighth Amendment . . . the focus is on the personal conduct and culpability of the offender." (Reply 4.)   Evans again argues that the "Government has not shown any record finding that Mr. Evans engaged in criminal conduct as an adult" and instead focuses on "conduct committed by other people after Mr. Evans turned eighteen." (Id. (emphasis in original).)   However, the persuasive force of the evidence as a whole about Evans's ongoing role in the conspiracy and Evans's daily conduct is

_____

[8] Even if the evidence demonstrated that Evans committed no overt act to further the conspiracy after December 5, 1991, "each member of the conspiracy is not required to commit an overt act to be found guilty of conspiracy so long as at least one member commits an act." Lispscomb, 494 F. App'x at 316 (citing Cardwell, 433 F.3d at 391).   Stanford Vann testified that between January 1, 1992 and his arrest, Stacey Robinson gave Evans, a man named "Eye," and himself an ounce each of crack cocaine to sell. (Dec. 1, 1992 Tr. 622.)   Moreover, nothing in the evidence suggested that the conspiracy stopped using Evans's house to store drugs into the new year.   Thus, the evidence at trial demonstrated that the conspiracy continued to function beyond Evans's eighteenth birthday.

28

sufficient to conclude that Evans personally engaged in conduct furthering the objectives of the conspiracy beyond his December 5, 1991 eighteenth birthday.

For example, witnesses testified that by the late Fall of 1991, Evans served as a "lieutenant" in the conspiracy and sold drugs every day from morning until late at night. Circumstantial evidence and reasonable inference conclusively demonstrate that Evans continued as a major player in the conspiracy beyond his eighteenth birthday.[9]   Chris Hamlin testified that, after he got out of jail in November of 1991, at most, one month before Evans's eighteenth birthday, he accompanied Stacey Robinson to purchase one half kilogram quantities of powder cocaine on two separate occasions.   (Dec. 3, 1992 Tr. 1444-45.)   Combined with the testimony about Evans's major role in the conspiracy, this evidence permits an inference that Evans and his co-conspirators distributed the drugs after Robinson procured them.

Moreover, the Court need not rely on the inevitable conclusion that Evans continued in the conspiracy based upon circumstantial evidence and inference. Stanford Vann testified that, between January 1, 1992 and Vann's arrest, Stacey Robinson

---

[9] The Court notes that it might be a different case if evidence existed demonstrating that the conspiracy experienced a major interruption in the late Fall of 1991.   However, no such evidence exists here.

29

gave Evans and Vann each an ounce of crack cocaine to sell. (Dec. 1, 1992 Tr. 622.) That was part of the operation of the conspiracy. Thus, Evans's liability beyond his eighteenth birthday stems from his own personal conduct, as well as from evidence about his continued involvement in the affairs of the conspiracy.

Not only did Evans fail to establish withdrawal, he even failed to demonstrate that his active involvement in the drug conspiracy occurred only before his eighteenth birthday. Hence, Evans has not demonstrated actual prejudice. Accordingly, Evans failed to meet his burden of demonstrating constitutional error for Count One.

## IV. CONCLUSION

Although the Court concludes that Evans has shown that Graham v. Florida, 560 U.S. 48 (2010), announced a new rule of constitutional law retroactively applicable on collateral review, Evans fails to demonstrate that Graham invalidates his sentence for Count One. Accordingly, Evans's § 2255 Motion claim will be denied as to Count One and granted as to Count Thirty-Six. The Court will order the parties to confer and file

positions on resentencing.  The Court will grant a certificate of appealability with respect to Count One.

The Clerk is directed to send a copy of this Memorandum Opinion to Evans and counsel of record.

It is so ORDERED.

_____  /s/  _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  March 2[, 2014